Matter of Sznajderman v Tax Appeals Trib. of the State of N.Y. (2019 NY Slip Op 00007)





Matter of Sznajderman v Tax Appeals Trib. of the State of N.Y.


2019 NY Slip Op 00007


Decided on January 3, 2019


Appellate Division, Third Department


Pritzker, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 3, 2019

523995

[*1]In the Matter of MARC S. SZNAJDERMAN et al., Petitioners,
v
TAX APPEALS TRIBUNAL OF THE STATE OF NEW YORK et al., Respondents.

Calendar Date: November 20, 2018

Before: Garry, P.J., Mulvey, Aarons, Rumsey and Pritzker, JJ.


Latham & Watkins LLP, New York City (Brian C. McManus of Latham & Watkins LLP, Boston, Massachusetts, of counsel, admitted pro hac vice), for petitioners.
Letitia James, Attorney General, Albany (Brian D. Ginsberg of counsel), for Commissioner of Taxation and Finance, respondent.



OPINION AND JUDGMENT
Pritzker, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Tax Law § 2016) to review a determination of respondent Tax Appeals Tribunal sustaining a notice of deficiency imposed under Tax Law article 22.
In 2001, petitioner Marc S. Sznajderman became a general partner in Belle Isle Drilling Company, a New York general partnership that was formed in 2001 to invest in the acquisition, drilling and development of oil and gas wells. In June 2002, pursuant to an extension from the Internal Revenue Service, petitioners filed their 2001 personal income taxes with returns from the partnership, including a claimed deduction of $751,076, $749,916 of which was derived through Sznajderman's share of intangible drilling costs (hereinafter IDCs) arising out of the oil and gas investment. In March 2008, the Department of Taxation and Finance issued a notice of deficiency to petitioners for their 2001 tax filing asserting additional New York State and New York City personal income tax, as well as penalties and interest in the sum of $193,613.15. Petitioners challenged the assessment and petitioned the Division of Tax Appeals (hereinafter the Division) for relief, asserting that the March 2008 notice of deficiency was made in error, specifically because it was issued more than three years after the subject return was filed, as is required by Tax Law § 683 (a),[FN1] and that the penalties imposed therein were arbitrary, excessive and invalid. In November 2012, a hearing was held before the Division, after which an Administrative Law Judge (hereinafter ALJ) determined, among other things, that the extended six-year limitations period should apply because the Belle Isle investment was an abusive tax [*2]avoidance transaction. Petitioners filed a notice of exception with respondent Tax Appeals Tribunal, which issued a July 2016 decision that affirmed the ALJ's determination. This CPLR article 78 proceeding ensued.
The gas and oil investments entered into by Sznajderman were sold as partnership units in Belle Isle. Each partnership unit was $280,000, which was to be paid by $100,000 in cash and a $180,000 interest bearing note. The promoter, Richard Siegal, in a proposal given to Sznajderman, touted not only a 10-15% profit on the cash investment, but also a tax deduction equal to 2.5 times that cash investment. Specifically, the proposal provided that "[a] $100,000 cash investment by an investor will result in a tax deduction of $250,000." The proposal detailed that "[s]ection 263 C of the Internal Revenue Code . . . allows electing taxpayers to expense the [IDCs] incurred drilling oil and gas wells which otherwise would be capitalized under normal accounting principles." Therefore, Belle Isle — via an interrelated series of agreements among the partnership — was structured to "maximize the[se] tax benefits," each partner being afforded "a substantial tax loss (active, [n]ot passive)." In particular, this rather complex structure included a subscription agreement and subscription note, a turnkey drilling contract and turnkey note, an additional collateral agreement for the purchase of bonds, a letter agreement and an assumption agreement. An understanding of these interlocking financial transactions is key when analyzing the taxation impact of the investment.
Subscription Agreement and Subscription Note
In December 2001, Sznajderman executed a subscription agreement wherein he agreed to purchase three partnership units in Belle Isle totaling $840,000, to be paid as follows: $300,000 in cash plus the execution of a promissory note in the amount of $540,000 (hereinafter the subscription note)[FN2]. The subscription note was payable on or before December 31, 2009 and bore an interest rate of 8% per annum. The subscription note could be extended for 25 years.
Interest on the subscription note was to be paid quarterly for the first year and, thereafter, was payable from Sznajderman's share of Belle Isle's net operating income [FN3]. If such revenues were not available or were insufficient, the unpaid interest would accrue. The subscription note also provided that 50% of Sznajderman's share of Belle Isle's revenues, after payment of interest, was to be applied to the outstanding principal balance of the note. Importantly, Sznajderman's subscription note included a provision that stated that the subscription note would be assigned by Belle Isle to SS & T Oil Co., Inc., a Siegal-controlled entity, which was party to a turnkey drilling contract (hereinafter the turnkey contract)[FN4] with Belle Isle "as security of partnership indebtedness."
Turnkey Contract and Turnkey Note
Under a turnkey contract between Belle Isle and SS & T, Belle Isle paid SS & T a $10,836,000 fixed fee to engage and complete all drilling operations for wells allocated to Belle [*3]Isle [FN5]. This fixed fee was paid by $3,773,700 in cash and a $7,062,300 promissory note (hereinafter turnkey note), which was due on December 31, 2009 and bore an interest rate of 8% per annum [FN6]. The accrued interest on the turnkey note and 50% of the principal were to be paid from net operating revenues of Belle Isle.
Additional Collateral Agreement and Letter Agreement
Along with the turnkey note, Sznajderman executed an additional collateral agreement that was accompanied by a letter agreement. Pursuant to these agreements, Sznajderman promised to pay SS & T 15% of the face value of his subscription note, which was $81,000. This payment was effectuated by an assignment of 60% of Sznajderman's Belle Isle distributions to SS & T until the value of said distributions equaled the 15% face value of the subscription note [FN7]. SS & T then guaranteed to invest that money in municipal bonds so that, at the end of 25 years, the sum would be equal to the principal amount of the subscription note, which would then be retired [FN8]. The letter agreement also stated that SS & T would make up any shortfall in the bonds by reinvesting the proceeds until the bond fund equaled the subscription note principal, at which point the bond proceeds would be used to pay off the subscription note in full. The letter agreement also indicated that the due date on the subscription note would be extended for up to 25 years, after payment of a fee, to be coextensive with the maturity date of the bonds.
Assumption Agreement
As referenced in the subscription note, Sznajderman also signed an assumption agreement with Belle Isle and SS & T whereby he agreed to assume personal liability for his pro rata share of the turnkey note, up to the amount of his subscription note obligation.
ALJ Determination
In a March 2014 determination, the ALJ found that, although the subscription note and turnkey note created genuine debt, thus supporting petitioners' claim that the Belle Isle investment was not an abusive tax avoidance transaction, petitioners failed to establish the reasonableness of the turnkey contract price. Such failure led the ALJ to conclude that "the [Belle Isle] transaction had tax avoidance as its primary motive and has no economic substance apart from the tax benefits conferred." This determination was based on credible expert testimony that established that the standard markup on a turnkey contract was 10-25% of the actual drilling costs. Specifically, the Division proffered testimony of an expert petroleum engineer who estimated that the actual expenses incurred in drilling the subject wells was approximately $2,050,000. Similarly, petitioners proffered the testimony of an expert in economics and finance who estimated the direct drilling expenses relating to Belle Isle's working interest to be $2,172,622, which included $1,787,449 in IDCs and $385,173 in tangible drilling costs. Notwithstanding these estimates proffered by the experts, the price of the turnkey contract at issue revealed a markup in excess of 500%. Testimony at the hearing also revealed that Siegal [*4]alone determined the price of the turnkey contract [FN9]. Accordingly, the ALJ concluded that the primary motive for the Belle Isle transaction was tax avoidance and had no economic substance apart from the tax benefits conferred, therefore determining that the extended six-year limitations period applied.
The Tribunal Determination
In a July 2016 decision, despite concluding that the ALJ was incorrect in determining that the subscription note and the turnkey note created genuine debt,[FN10] the Tribunal affirmed the determination of the ALJ. In rendering this determination, the Tribunal found that "Belle Isle . . . employed a financing structure designed to artificially inflate the actual capital contributions of its partners." Based upon this financing structure, as well as the Tribunal's adoption of the ALJ's determination that petitioners failed to establish the reasonableness of the turnkey contract price, we agree with the Tribunal's conclusion that Sznajderman's investment constituted an abusive tax avoidance transaction.
Legal Discussion
A tax avoidance transaction is broadly defined as "a plan or arrangement devised for the principal purpose of avoiding tax," including what are known as "listed transactions" (Tax Law § 683 [c] [11] [B]). "For purposes of identifying a [listed transaction], the determination that a type of transaction is a tax avoidance transaction shall be based upon a finding . . . that: (1) the transaction is not done for a valid business purpose, that is, one or more business purposes, other than obtaining tax benefits, that alone or in combination constitute primary motivation for the transaction; (2) the transaction does not have economic substance apart from its tax benefits; or (3) the tax treatment of the transaction is based upon an elevation of form over substance" (20 NYCRR 2500.3 [b]).[FN11]
The Tribunal's determination as to whether a particular investment is an abusive tax avoidance transaction involves the statutory application to a particular situation and "entails a fact-based inquiry on a matter within the Tribunal's expertise" (Matter of Stevenson v New York State Tax Appeals Trib., 106 AD3d 1146, 1147-1148 [2013]; see Matter of Sacks v Tax Appeals Trib. of the State of N.Y., 99 AD3d 1120, 1121 [2012], lv denied 21 NY3d 857 [2013]). "The Tribunal's determination will not be disturbed if it is rationally based and is supported by substantial evidence in the record, even if a different result could have been reached" (Matter of 21 Club, Inc. v Tax Appeals Trib. of State of N.Y., 69 AD3d 996, 997 [2010]; see Matter of Ingle v Tax Appeals Trib. of the Dept. of Taxation & Fin. of the State of N.Y., 110 AD3d 1392, [*5]1393 [2013]; Matter of CBS Corp. v Tax Appeals Trib. of State of N.Y., 56 AD3d 908, 909 [2008], lv denied 12 NY3d 703]).
The Tribunal's determination that the overall financing structure artificially inflated the actual capital contributions of the Belle Isle partners, allowing large tax deductions based upon IDCs derived through the inflated turnkey contract, is rationally based and supported by substantial evidence (see Matter of 21 Club, Inc. v Tax Appeals Trib. of State of N.Y., 69 AD3d at 997). Beginning with the Belle Isle financing structure, particularly Sznajderman's subscription note, it is clear that Belle Isle did not have an intent to create a true debtor-creditor relationship as to 85% of the face value of the note. Specifically, while the face value of the subscription note was $540,000, the additional collateral agreement had the practical effect of satisfying the principal of said note by Sznajderman's payment of only 15% of the face value, which was to be used by SS & T, the so-called creditor, to purchase bonds. Importantly, these bonds were not collateral; rather, they were ostensibly used to pay off the principal of the subscription note in 25 years. This conclusion is supported by the letter agreement, which guaranteed that, if the bonds did not satisfy the principal, they would be reinvested until the bond fund equaled the face value of the note. This letter agreement also stated that the term of the subscription note would be extended so as to be coextensive with the maturity date of the bonds. As correctly noted by the Tribunal, "the bond fund was not a sinking fund to secure repayment, but was, in fact, the repayment itself." In fact, according to an email written by Siegal to Sznajderman, "[s]ince 1981 when we began structuring these ventures, no one has ever been required to pay any portion of their notes."[FN12]
Further, Sznajderman's payment of interest during the first year did not legitimize the debt because interest after the first year, which was designed to be paid from Sznajderman's net operating proceeds, was only paid sporadically, despite such proceeds being available. We agree with the Tribunal that, based upon this sporadic collection of interest, it is highly unlikely that Belle Isle would attempt to collect "its partners' very large interest accruals when the subscription notes mature."[FN13] As such, we find that substantial evidence supports the Tribunal's conclusion that, while Sznajderman's investment had economic substance in general,[FN14] the subscription note, to the extent of 85% of its face value, was artificially inflated and, as such, did not establish true debt and most certainly elevated form over substance (see generally 20 NYCRR 2500.3 [b]).
In this regard, petitioners assert that the subscription notes were not "capital contributions" as used in the context of partnership taxation and, therefore, such artificial inflation could not afford the partners a greater tax basis from which to deduct IDCs than they would have otherwise been able to take. This claim elevates form over substance because the interrelationship of the subscription note, the turnkey contract and the assumption agreement joined to create an abusive tax avoidance transaction by artificially inflating the tax basis. First, as stated by petitioners, there is no question that the investor's capital contribution to Belle Isle, which is the tax basis, is "his [or her] proportionate share of Belle Isle's partnership-level debt to SS & T pursuant to . . . the [t]urnkey [n]ote." Further, pursuant to the assumption agreement, this share "shall in no event exceed the sum of the principal amount of [his or her] [s]ubscription [n]ote plus accrued interest thereon," and "shall be deemed satisfied to the extent his [or her] share of [i]ndebtedness has been repaid from the proceeds of [his or her] [s]ubscription [n]ote." [*6]Therefore, respondent Commissioner of Taxation and Finance correctly notes in his brief that, "as a result of the assumption agreement — as [petitioners'] financial expert . . . acknowledged — [petitioners'] proportionate share of Belle Isle's partnership-level debt to SS & T essentially was his subscription note."
Moreover, inasmuch as the turnkey contract's price bore no relationship to reasonably projected or actual drilling costs, instead being correlated with the promised 250% tax deduction, the price of the turnkey contract and debt reflected in the turnkey note were artificially inflated [FN15]. As such, the IDCs generated thereby, which were deducted by petitioners dollar for dollar, were sorely lacking in economic reality. Simply stated, Sznajderman's Belle Isle investment elevated form over substance and was principally designed to avoid taxes (see 20 NYCRR 2500.3 [b]; Matter of 21 Club, Inc. v Tax Appeals Trib. of State of N.Y., 69 AD3d at 997; Matter of Ingle v Tax Appeals Trib. of the Dept. of Taxation & Fin. of the State of N.Y., 110 AD3d at 1393). Thus, the extended six-year statute of limitations applied, rendering the subject notice of deficiency timely filed pursuant to Tax Law § 683. Petitioners' remaining arguments, to the extent not specifically addressed, have been examined and found to be lacking in merit.
Garry, P.J., Mulvey, Aarons and Rumsey, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.



Footnotes

Footnote 1: Pursuant to Tax Law § 683 (a), any tax "shall be assessed within three years after the return was filed," however, "tax may be assessed at any time within six years after the return was filed if the deficiency is attributable to an abusive tax avoidance transaction" (Tax Law § 683 [c] [11] [B]).

Footnote 2: In all, the general partners in Belle Isle contributed capital in the stated amount of $10,985,800, $3,923,500 of which was cash and $7,062,300 consisted of subscription notes.

Footnote 3: As of 2011, Sznajderman had paid $60,552 in interest on the subscription note, including four payments of $10,800 in 2002, and the accrued, but unpaid, subscription note interest balance was $371,402.

Footnote 4: Turnkey drilling contracts are common and provide that the driller is paid a fixed fee to manage, supervise and develop wells up to the point of production. The driller assumes the risk of all costs, including cost overruns and delays incurred prior to commencement of production, shifting and hedging some of the investor's risk.

Footnote 5: Pursuant to a separate prospect agreement, Belle Isle acquired 37 oil and gas wells from Palace Exploration Company, a Siegal owned and controlled company. This agreement gave Belle Isle full rights to explore, drill and produce oil and gas from the wells.

Footnote 6: The amount of the turnkey note was equal to the total amount of all partners' subscription notes. Also, like the subscription note, the turnkey note could be extended for 25 years.

Footnote 7: In 2004, the 60% assignment was increased to 75%.

Footnote 8: Sznajderman did, in fact, pay SS & T $81,000 through assignment of his distributions.

Footnote 9: The Tribunal subsequently found that there was no evidence presented as to how Siegal established the price for the turnkey contract.

Footnote 10: The Tribunal noted that Zeluck v Commissioner of Internal Revenue (103 TC Memo 2012-98 [2012]), upon which the ALJ relied in reaching this determination, was distinguishable from petitioners' case. Zeluck dealt with another Siegal oil partnership with a very similar financial structure. In Zeluck, however, there is no reference to any option for the taxpayer to fulfill the subscription note principal obligation through the purchase of bonds (id.).

Footnote 11: Treasury regulations promulgated under the Internal Revenue Code define "tax shelter" in a similar manner; a plan or arrangement with the principal purpose of avoiding or evading tax (see 26 CFR 1.6662-4 [g] [2] [i]). Such regulations further explain that "[t]ypical of tax shelters are transactions structured with little or no motive for the realization of economic gain, and transactions that utilize the mismatching of income and deductions, overvalued assets or assets with values subject to substantial uncertainty, certain nonrecourse financing, financing techniques that do not conform to standard commercial business practices, or the mischaracterization of the substance of the transaction" (26 CFR 1.6662-4 [g] [2] [i]).

Footnote 12: The fact that the investor remained personally liable on the note changes nothing, as the likelihood of the investor's actual repayment was almost nonexistent given that the bonds were "virtually risk-free" federally insured municipal bonds (Key Bank N.A. v Milham, 141 F3d 420, 424 [2d Cir 1998], cert denied 525 US 872 [1998]).

Footnote 13: As of 2012, there was $4,857,585 in total unpaid accrued interest against all the partners.

Footnote 14: "The existence of economic substance does not of itself establish that a transaction is not a tax shelter if the transaction includes other characteristics that indicate it is a tax shelter" (26 CFR 1.6662-4 [g] [2] [i]).

Footnote 15: We note that the turnkey contract was not an arm's length transaction.